# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **JANE E. LOPINSKY,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:09cv00054 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

### I. Background and Standard of Review

Plaintiff, Jane E. Lopinsky, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq.* (West 2003 & Supp. 2010). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."

*Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence.'"" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Lopinsky filed her applications for DIB and SSI on February 27, 2007, alleging disability as of January 2, 2002, due to musculoskeletal problems, high blood pressure, obesity and mental impairments. (Record, ("R."), at 127-38, 148.) The claims were denied initially and on reconsideration. (R. at 57-59, 62-64, 68-69, 70-74.) Lopinsky then requested a hearing before an administrative law judge, ("ALJ"), which was held on January 29, 2009, and at which she was represented by counsel. (R. at 27-52.)

By decision dated March 31, 2009, the ALJ denied Lopinsky's claims. (R. at 11-24.) The ALJ found that Lopinsky met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2007. (R. at 13.) The ALJ also found that the record was insufficient to establish that Lopinsky had engaged in substantial gainful activity since January 2, 2002, the alleged onset date. (R. at 13.) The ALJ determined that the medical evidence established that Lopinsky suffered from severe impairments, namely musculoskeletal disorders and obesity, but he found that Lopinsky did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 14, 19.) The ALJ found that Lopinsky had the residual functional capacity to perform light work[1] limited by an occasional ability to climb ladders or crawl, a

---

[1]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, she also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2009).

limited ability to reach with her upper extremities, including overhead, and an inability to work around hazards, such as moving machinery and unprotected heights. (R. at 20.) The ALJ found that Lopinsky was able to perform her past relevant work as a beauty consultant, a data entry clerk and an office manager. (R. at 23.) In addition, based on Lopinsky's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that Lopinsky could perform, including jobs as a sales clerk and a janitor. (R. at 23.) Thus, the ALJ found that Lopinsky was not under a disability as defined under the Act and was not eligible for benefits. (R. at 23-24.) *See* 20 C.F.R. §§ 404.1520(f)&(g), 416.920(f)&(g) (2009).

After the ALJ issued his decision, Lopinsky pursued her administrative appeals, (R. at 6), but the Appeals Council denied her request for review. (R. at 1-5.) Lopinsky then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2009). The case is before this court on Lopinsky's motion for summary judgment filed January 27, 2010, and the Commissioner's motion for summary judgment filed February 25, 2010.

## II. Facts

Lopinsky was born in 1960, (R. at 30, 127, 131), which, at the time of the ALJ's decision, classified her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). She completed the ninth grade, but later obtained a general equivalency development, ("GED"), diploma. (R. at 30, 152.) She has past relevant work experience as a data entry clerk, an office manager and an independent beauty consultant. (R. at 149, 173.) Lopinsky stated that her medication helped her symptoms

of depression and insomnia. (R. at 41.)

Gerald Wells, a vocational expert, also was present and testified at Lopinsky's hearing. (R. at 47-51.) Wells classified Lopinsky's work as a data entry clerk and an office manager as sedentary[2] and semiskilled and her job as a Mary Kay beauty consultant as light and semiskilled. (R. at 47-48.) Wells was asked to consider a hypothetical individual of Lopinsky's age, education and past work experience and who had various limitations.[3] (R. at 48.) Wells identified light and sedentary jobs that such an individual could perform, including Lopinsky's past work as an independent beauty consultant. (R. at 49.) Wells further identified jobs that existed in significant numbers in the national and regional economies that such an individual could perform, including jobs in retail sales and as a receptionist and a janitor. (R. at 49-50.)

In rendering his decision, the ALJ reviewed records from Dr. Michael J. Diminick, M.D., an orthopedic surgeon; Dr. Dudley A. Raine, Jr., M.D.; Dr. Charles R. Joseph, M.D., a neurologist; Dr. Thomas Dobyns, M.D.; Dr. Frank M. Johnson, M.D., a state agency physician; Louis Perrott, Ph.D., a state agency psychologist; Dr. Charles R. Joseph, M.D.; Eugenie Hamilton, Ph.D., a state agency psychologist; Will Likins, D.C., a chiropractor; Jan Gardner-Harris, L.C.S.W., a licensed clinical social

_____

[2]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying items like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing often is necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2009).

[3]The transcript of the hypothetical presented to the vocational expert is largely "inaudible." (R. at 48-49.) Therefore, the undersigned cannot determine what limitations the vocational expert was asked to consider.

worker; and Piedmont Psychiatric Center.

On April 21, 2000, Dr. Dudley A. Raine, Jr., M.D., saw Lopinsky for complaints of left shoulder and forearm pain. (R. at 282-83, 312-13.) Dr. Raine referred Lopinsky for a neurological evaluation with Dr. Charles R. Joseph, M.D. (R. at 282, 312, 528-29.) Dr. Joseph found no evidence of neuropathy, plexopathy or radiculopathy in the left upper extremity. (R. at 282, 312, 324, 528.) On April 25, 2000, an x-ray of Lopinsky's cervical spine showed cervical curvature consistent with paravertebral muscle spasm and mild degenerative change at the C6-7 level. (R. at 272, 416.) In September 2000, Lopinsky saw Dr. Raine for complaints of bilateral shoulder pain with the left being greater than the right. (R. at 282, 312.) In January 2001, Lopinsky was diagnosed with hypertension, anxiety disorder and bilateral carpal tunnel syndrome. (R. at 394.) In March 2001, Lopinsky complained of bilateral shoulder pain and depression. (R. at 393.) In January 2002, Dr. Raine reported that Lopinsky was temporarily disabled due to bilateral shoulder pain. (R. at 283, 313.) In April 2003, Dr. Raine diagnosed Lopinsky with hypertension and anxiety disorder. (R. at 382.) In June 2003, Lopinsky complained of depression, which Dr. Raine characterized as situational depression. (R. at 377.) The record shows that Dr. Raine continued to treat Lopinsky through February 2006 for complaints of insomnia, hypertension and anxiety. (R. at 349, 354, 364.)

On October 24, 2000, Lopinsky saw Dr. Michael J. Diminick, M.D., an orthopedic surgeon, for complaints of bilateral shoulder pain. (R. at 286.) Dr. Diminick diagnosed bilateral impingement syndrome. (R. at 286.) On April 11, 2001, Lopinsky complained of left hand numbness. (R. at 290.) Dr. Diminick diagnosed ulnar neuropathy. (R. at 290.) On June 21, 2001, Lopinsky underwent ulnar nerve

decompression and transposition. (R. at 295.) On June 25, 2001, Lopinsky stated that her symptoms were significantly improved with resolution of the ulnar nerve symptoms. (R. at 296.) She had full range of motion of her elbow. (R. at 296.) An MRI of Lopinsky's left shoulder taken on August 15, 2001, showed possible marrow edema, a possible cyst, a partial tear and degenerative changes. (R. at 265-66, 298-99.) On October 3, 2001, Lopinsky saw Dr. Diminick for complaints of left shoulder pain. (R. at 273.) Dr. Diminick diagnosed left shoulder pain consistent with impingement and recommended left shoulder arthroscopy and subacromial decompression, which was performed on October 5, 2001. (R. at 273, 275, 308.) On October 15, 2001, Lopinsky had minimal complaints of pain following her subacromial decompression. (R. at 309.) Dr. Diminick planned to perform a right subacromial decompression. (R. at 309.) On November 19, 2001, an MRI of Lopinsky's right shoulder showed hypertrophic spurring and degenerative change at the acromioclavicular joint with a high grade partial or small tear of the supraspinatus muscle at its attachment site. (R. at 264, 310.) On January 11, 2002, Dr. Diminick reported that Lopinsky was temporarily disabled. (R. at 285.) On May 28, 2002, Lopinsky underwent a right subacromial decompression for right shoulder impingement syndrome. (R. at 276-77.)

By letter dated November 4, 2003, Dr. Diminick noted that he had treated Lopinsky for bilateral rotator cuff injuries and ulnar neuropathies. (R. at 226.) He reported that Lopinsky had been "permanently disabled" between May 28, 2002, and March 20, 2003. (R. at 226.) Dr. Diminick reported that Lopinsky continued to be significantly limited, but was not considered totally disabled. (R. at 226.) He noted that she was unable to work in a full-time position. (R. at 226.) On January 30, 2004, Dr. Diminick completed a Work Capacity Evaluation indicating that Lopinsky was limited to reaching above shoulder height, noting that she could do so for only two

hours in an eight-hour workday. (R. at 229.) On July 7, 2004, an MRI of Lopinsky's cervical spine was performed, which showed mild disc degenerative changes at the C4-5, C5-6 and C6-7 disc spaces characterized by diffuse annular bulges. (R. at 220, 541.) No herniations, protrusions or significant spinal stenosis were identified. (R. at 220, 541.)

On September 7, 2004, Lopinsky complained of right elbow pain and numbness. (R. at 271.) Electromyogram nerve conduction studies showed moderate ulnar nerve compression at the elbow. (R. at 271.) She underwent a right ulnar nerve transposition. (R. at 269-70.) On October 12, 2004, Dr. Diminick reported that Lopinsky had good range of motion of the elbow and normal strength in the ulnar nerve distribution. (R. at 231.) On November 10, 2004, Lopinsky reported that her symptoms had resolved, and she voiced no complaints. (R. at 230.) Dr. Diminick reported that Lopinsky was neurovascularly intact and that she had good motor function of the ulnar nerve. (R. at 230.) By letter dated February 23, 2005, Dr. Diminick noted that Lopinsky had been under his care for bilateral upper extremity symptoms, including bilateral subacromial decompression and bilateral ulnar nerve transpositions. (R. at 223.) He reported that Lopinsky's symptoms were improving. (R. at 223.) Dr. Diminick reported that Lopinsky's left upper extremity was essentially healed, but that it was too soon to ascertain whether her right upper extremity had healed to the maximum extent. (R. at 223.) On December 6, 2007, Lopinsky complained of pain in both median nerve distributions. (R. at 552.) Electrodiagnostic studies confirmed bilateral median nerve neuropathies. (R. at 552.) On May 31, 2000, Dr. Joseph examined Lopinsky for her complaints of left shoulder pain and left arm pain. (R. at 528-30.) Nerve conduction studies showed normal left median and ulnar sensory and motor responses. (R. at 528-29.) No evidence of neuropathy, plexopathy

or radiculopathy was noted in the left upper extremity. (R. at 528.) On May 24, 2001, Dr. Joseph examined Lopinsky for complaints of pain and numbness in her left hand. (R. at 478-79, 537-38.) Nerve conduction studies showed a reduced left ulnar motor velocity at the elbow, and the left median sensory latency was minimally prolonged. (R. at 478-79, 538.) An EMG showed moderately severe left ulnar neuropathy at the elbow and mild left median sensory neuropathy at the wrist. (R. at 478.) On February 17, 2004, Dr. Joseph examined Lopinsky for her complaints of pain and cramping in her right hand and forearm. (R. at 476-77, 535-36.) An electromyogram was performed and showed that Lopinsky had moderately severe right ulnar neuropathy at the elbow and mild right median neuropathy of the wrist. (R. at 476-77, 535-36.) On July 23, 2007, Dr. Joseph examined Lopinsky for complaints of tingling and numbness in her hands. (R. at 475, 534, 551.) Dr. Joseph reported that Lopinsky had no neurologic deficit. (R. at 475, 534, 551.) He reported that a review of Lopinsky's neck x-rays showed some arthritis. (R. at 475, 534, 551.) Dr. Joseph recommended conservative treatment for Lopinsky's neck. (R. at 475, 534, 551.) Dr. Joseph recommended wrist splints for the tingling in Lopinsky's hands. (R. at 475, 534, 551.) On December 3, 2007, Dr. Joseph reported that Lopinsky had moderately severe right median entrapment, which would require surgical intervention. (R. at 531-33, 548-50.)

The record shows that Lopinsky saw Will Likins, D.C., a chiropractor, from August 16, 2006, through September 28, 2007, for her complaints of neck pain and numbness in both hands. (R. at 542-44.) On September 7, 2007, it was noted that Lopinsky had made significant progress, as indicated by a decrease in pain levels. (R. at 543.) On September 14, 2007, it was noted that Lopinsky had increased range of motion. (R. at 543.) Progress notes indicate that Lopinsky continued to have a positive response to treatment. (R. at 544.)

On May 7, 2007, Dr. Thomas Dobyns, M.D., examined Lopinsky at the request of Disability Determination Services. (R. at 424-29.) Lopinsky alleged disability due to leg, neck, back and arm problems, high blood pressure, obesity, anxiety and sleep problems. (R. at 424.) Lopinsky had a slight decrease in range of motion of her neck. (R. at 426.) She had full range of motion in all extremities. (R. at 426.) Lopinsky had normal range of motion in the elbows, wrists and hands. (R. at 426.) Lopinsky reported that she could walk one mile on flat ground at a comfortable pace. (R. at 427.) She also reported that her ability to sit and stand was unrestricted. (R. at 427.) Dr. Dobyns diagnosed probable bilateral carpal tunnel disease, possible early arthritis to the right knee, anxiety disorder with insomnia, hypertension, well-controlled, and obesity. (R. at 427.) Dr. Dobyns reported that Lopinsky was doing "fairly well." (R. at 427.) He indicated that Lopinsky would be restricted in the fine and gross use of her hands because of median nerve distribution sensory loss and mild grip strength loss. (R. at 428.) Dr. Dobyns reported that Lopinsky could occasionally lift and carry items weighing up to 25 pounds and frequently lift and carry items weighing up to 10 pounds. (R. at 428.) He reported that Lopinsky's mental examination was normal. (R. at 428.) Dr. Dobyns reported that Lopinsky had a 10 percent disability of the right shoulder and a zero percent disability of the left shoulder. (R. at 428.)

On May 17, 2007, Dr. Frank M. Johnson, M.D., a state agency physician, reported that Lopinsky had the residual functional capacity to perform light work prior to December 31, 2006.[4] (R. at 431-37.) He indicated that Lopinsky was limited in her

---

[4]This assessment was made to determine Lopinsky's limitations on or before her date last insured, which was listed on this assessment as December 31, 2006. (R. at 437.) However, Lopinsky's date last insured, as determined by the Social Security Administration, and as found by the ALJ, was December 31, 2007. (R. at 13, 139.)

ability to push and/or pull with her upper extremities. (R. at 432.) Dr. Johnson noted that Lopinsky's ability to reach in all directions was limited. (R. at 433.) No postural, visual, communicative or environmental limitations were noted. (R. at 433-34.) Dr. Johnson states that there was no evidence of carpal tunnel disease on or before Lopinsky's date last insured. (R. at 437.) Unfortunately, the form completed by Dr. Johnson incorrectly lists Lopinsky's last insured date as December 31, 2006. (R. at 431.)

That same day, Dr. Johnson completed a second assessment indicating that Lopinsky had the residual functional capacity to perform preform light work between January 2, 2002, Lopinsky's alleged onset date, and May 17, 2007, the date of the assessment. (R. at 439-46.) He indicated that Lopinsky was limited in her ability to push and/or pull with her upper extremities. (R. at 440.) Dr. Johnson reported that Lopinsky could occasionally climb and that she was limited in her ability to reach, to handle, to finger and to feel. (R. at 441.) No visual, communicative or environmental limitations were noted. (R. at 441-42.) Dr. Johnson noted that he gave great weight to the May 14, 2007, report of Dr. Dobyns in reaching his findings with regard to Lopinsky's SSI claim. (R. at 446.)

On May 18, 2007, Louis Perrott, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Lopinsky did not suffer from a medically determinable mental impairment on or before December 31, 2006.[5] (R. at 448-60.) That same day, Perrott completed a second PRTF indicating that between January 2, 2002, the alleged onset date, and May 18, 2007, the date of

_____

[5]This assessment was made to determine Lopinsky's limitations on or before her date last insured, which again was listed on the assessment as December 31, 2006. (R. at 448.)

the assessment, Lopinsky suffered from a nonsevere affective disorder and a nonsevere anxiety-related disorder. (R. at 461-73.) He indicated that Lopinsky had no limitations in her abilities to perform her activities of daily living, in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 471.) He reported that Lopinsky had not suffered any episodes of decompensation. (R. at 471.)

On September 26, 2007, Eugenie Hamilton, Ph.D., a state agency psychologist, completed a PRTF indicating that Lopinsky did not suffer from a severe mental impairment between January 2, 2002, to December 31, 2006.[6] (R. at 499-511.) That same day, Hamilton completed a second PRTF indicating that Lopinsky suffered from a nonsevere affective disorder and anxiety-related disorder between January 2, 2002, the alleged onset date, and September 26, 2007, the date of the assessment. (R. at 485-98.) Hamilton found that Lopinsky had no limitations in her abilities to perform her activities of daily living, in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 495.) She found that Lopinsky had not suffered any episodes of decompensation. (R. at 495.)

On September 27, 2007, Dr. Shirish Shahane, M.D., a state agency physician, completed a residual functional capacity assessment indicating that Lopinsky could perform light work prior to December 31, 2006.[7] (R. at 521-27.) Dr. Shahane indicated that Lopinsky was limited in her ability to push and/or pull with her upper extremities.

[6]This assessment was made to determine Lopinsky's limitations on or before her date last insured. However, this date is again incorrectly listed as December 31, 2006, instead of December 31, 2007. (R. at 499.)

[7]This assessment was made to determine Lopinsky's limitations on or before her date last insured, which again was listed as December 31, 2006. (R. at 521.)

(R. at 522.) Dr. Shahane reported that Lopinsky could frequently climb ramps and stairs, that she could occasionally climb ladders and never climb ropes or scaffolds. (R. at 523.) Dr. Shahane reported that Lopinsky could frequently balance, stoop, kneel and crouch and occasionally crawl. (R. at 523.) Dr. Shahane noted that Lopinsky's ability to reach in all directions was limited. (R. at 523.) Dr. Shahane found that Lopinsky should avoid concentrated exposure to work hazards, including machinery and heights. (R. at 524.) No visual or communicative limitations were noted. (R. at 523-24.) Dr. Shahane also stated that there was no evidence of carpal tunnel disease on or before Lopinsky's date last insured. (R. at 527.) Unfortunately, Dr. Shahane also incorrectly lists Lopinsky's last insured date as December 31, 2006. (R. at 521.)

That same day, Dr. Shahane completed a second assessment indicating that Lopinsky had the residual functional capacity to perform light work between January 2, 2002, and September 27, 2007. (R. at 513-20.) Dr. Shahane indicated that Lopinsky was limited in her ability to push and/or pull with her upper extremities. (R. at 514.) Dr. Shahane reported that Lopinsky could occasionally climb stairs and ladders, balance and frequently use ramps, but never climb ropes or scaffolds. (R. at 515.) He further found that she could occasionally stoop, kneel, crouch and crawl. (R. at 515.) Dr. Shahane found that Lopinsky was limited in her ability to reach in all directions. (R. at 515.) Dr. Shahane found that Lopinsky should avoid concentrated exposure to work hazards, including machinery and heights. (R. at 516.) No visual or communicative limitations were noted. (R. at 515-16.)

On December 4, 2007, Lopinsky saw Jan Gardner-Harris, L.C.S.W., a licensed clinical social worker, for her complaints of depression and anxiety. (R. at 560-61.) Gardner-Harris reported that Lopinsky's recent and remote recall was intact. (R. at

561.) Lopinsky's insight and judgment also were intact. (R. at 561.) Gardner-Harris diagnosed major depressive disorder, rule out generalized anxiety disorder and rule out obsessive compulsive disorder. (R. at 561.) Gardner-Harris reported that Lopinsky had a then-current Global Assessment of Functioning score,[8] ("GAF"), of 51.[9] (R. at 561.) On December 13, 2007, Lopinsky described her mood as "good." (R. at 574.) She reported a decrease in crying spells and denied irritability. (R. at 574.) Lopinsky reported that she did repetitious counting, which consisted of counting to 44 before she would allow anything to take place. (R. at 574.) For example, she would not allow the car door to be opened until she finished counting to 44. (R. at 574.) On December 27, 2007, Lopinsky reported that her affect and mood had improved. (R. at 572-73.) She reported that she had been getting out and enjoying activities with her husband. (R. at 573.) On February 4, 2008, Lopinsky described her mood as "sad." (R. at 568.) She reported a slight increase in irritability. (R. at 568.) She reported continued frustration at not being able to perform normal activities due to pain and cramping in her hands, arms and shoulders. (R. at 568.) On February 21, 2008, Lopinsky reported that her mood was "better than last time." (R. at 566.) She reported increased irritability, which she related to her husband not working. (R. at 566.) She also reported increased stress due to bill collectors, lack of finances and awaiting a hearing date on her disability claim. (R. at 566.) On March 10, 2008, Lopinsky described her mood as being like "a rubber band," stating that she felt like she would "snap." (R. at 564.)

---

[8]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[9]A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning ...." DSM-IV at 32.

On September 22, 2008, Lopinsky was seen at Piedmont Psychiatric Center and was diagnosed with major depressive disorder and obsessive-compulsive disorder. (R. at 576-77.)

### III. Analysis

The Commissioner uses a five-step process in evaluating SSI and DIB claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2009); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2009).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2010); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir.

1980).

By decision dated March 31, 2009, the ALJ denied Lopinsky's claims. (R. at 11-24.) The ALJ determined that the medical evidence established that Lopinsky suffered from severe impairments, namely musculoskeletal disorders and obesity, but he found that Lopinsky did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 14, 19.) The ALJ found that Lopinsky had the residual functional capacity to perform light work limited by an occasional ability to climb ladders or crawl, a limited ability to reach with her upper extremities, including overhead, and an inability to work around hazards, such as moving machinery and unprotected heights. (R. at 20.) The ALJ found that Lopinsky was able to perform her past relevant work as a beauty consultant, a data entry clerk and an office manager. (R. at 23.) In addition, based on Lopinsky's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that other jobs existed in significant numbers in the national economy that Lopinsky could perform, including jobs as a sales clerk and a janitor. (R. at 23.) Thus, the ALJ found that Lopinsky was not under a disability as defined under the Act and was not eligible for benefits. (R. at 23-24.)  *See* 20 C.F.R. §§ 404.1520(f)&(g), 416.920(f)&(g).

Lopinsky argues that the ALJ's determination of her residual functional capacity is not supported by substantial evidence. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 10-11.) Lopinsky argues that the ALJ erred by failing to include her manipulative limitations in her residual functional capacity. (Plaintiff's Brief at 18.) Lopinsky argues that the ALJ failed to mention the opinion of state agency physician, Dr. Johnson, in his decision.

(Plaintiff's Brief at 11-14.) She also argues that the ALJ erred by failing to give greater weight to Dr. Dobyns's opinion. (Plaintiff's Brief at 15.) She further argues that the ALJ erred by failing to find that she suffered from a severe mental impairment and by failing to order a consultative exam to determine her mental limitations. (Plaintiff's Brief at 19-23.) Finally, Lopinsky argues that the ALJ relied on the vocational expert's testimony in finding that she could perform her past work, as well as other work in the national economy, when a review of the hearing transcript shows that the hypothetical questions presented to the vocational expert were mostly inaudible and not properly recorded in the transcript. (Plaintiff's Brief at 23-24.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one

from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings. Lopinsky argues that the ALJ erred by failing to find that she suffered from a severe mental impairment. (Plaintiff's Brief at 19-21.)

Lopinsky argues that the ALJ's determination of her residual functional capacity is not supported by substantial evidence. She argues that the ALJ erred by failing to include her manipulative limitations with feeling and handling in his residual functional capacity finding. (Plaintiff's Brief at 18.) Based on my review of the record, I agree. The ALJ found that Lopinsky was limited in her ability to reach with her upper extremities. (R. at 20.) The ALJ noted that he was rejecting Dr. Dobyns's finding that Lopinsky had manipulative limitations because it was neither supported by nor consistent with the evidence of record. (R. at 22.) Instead, the ALJ noted that he was relying on the opinions of the state agency physicians, Drs. Johnson and Shahane, more specifically, those found at Exhibit 6F, Exhibit 17F and Exhibit 18F in the record on appeal.[10] (R. at 22.) A review of the record does not support the ALJ's rejection of Dr. Dobyns's manipulative limitations, however.

In May 2007, Dr. Dobyns found that Lopinsky was restricted in her ability to

---

[10]I note that other assessments from Drs. Johnson and Shahane are contained in the record, but the ALJ stated that he was affording considerable weight to those opinions at Exhibit 6F, Exhibit 17F and Exhibit 18F. I further note that Exhibit 6F, a residual functional capacity assessment completed by Dr. Johnson, and Exhibit18F, a residual functional capacity assessment completed by Dr. Shahane were evaluations of Lopinsky's limitations as of her date last insured. However, both of these assessments incorrectly listed this date last insured as December 31, 2006, instead of December 31, 2007. They also both stated that there was no evidence of carpal tunnel disease on or before this incorrect date last insured. (R. at 437, 527.) I note, however, that the record clearly shows evidence of carpal tunnel disease on or before December 31, 2007, the actual date last insured.

use her hands for fine and gross manipulations due to median nerve distribution sensory loss and mild grip strength loss. (R. at 428.) While Dr. Shahane did not indicate that Lopinsky had limitations in her manipulative abilities, Dr. Johnson did. (R. at 441.) Specifically, Dr. Johnson, in a residual functional capacity assessment not specifically afforded considerable weight by the ALJ, found that Lopinsky was limited in her ability to reach, to handle, to finger and to feel after December 31, 2006, the incorrectly listed date last insured. (R. at 441.) It appears that Dr. Johnson agrees that, once Lopinsky was diagnosed with carpal tunnel syndrome, she would have limitations on her manipulative abilities. The record indicates that Lopinsky complained of tingling and numbness in her hands, and electrodiagnostic studies confirmed bilateral median nerve neuropathies prior to her actual last insured date in December 2007. (R. at 475, 534, 551-52.) In December 2007, Dr. Joseph diagnosed moderately severe right median entrapment. (R. at 531-33, 548-50.) Based on this, I do not find that substantial evidence supports the ALJ's weighing of the medical evidence. Thus, I find that substantial evidence does not exist to support the ALJ's finding with regard to Lopinsky's physical residual functional capacity.

I next will address Lopinsky's argument that the ALJ erred by failing to find that she suffered from a severe mental impairment. (Plaintiff's Brief at 19-23.) The Social Security regulations define a "nonsevere" impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. §§ 404.1521(a), 416.921(a) (2009). In the context of a mental impairment, basic work activities include understanding, carrying out and remembering simple job instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routing work setting. *See* 20 C.F.R. §§ 404.1521(b), 416.921(b) (2009). The Fourth

Circuit held in *Evans v. Heckler*, that "'"[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience."'" 734 F.2d 1012, 1014 (4th Cir. 1984) (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)) (citations omitted).

In arriving at the conclusion that Lopinsky's mental impairments were nonsevere, the ALJ noted that none of Lopinsky's treating physicians had placed any limitations on her work-related mental abilities. (R. at 19.) Although Lopinsky was diagnosed with depression, (R. at 377), major depressive disorder, (R. at 561, 576-77), and anxiety disorder, (R. at 354, 364, 461-73, 485-98), no limitations were imposed on Lopinsky's work-related mental abilities by any source. In fact, in May 2007, Dr. Dobyns reported that Lopinsky's mental examination was normal. (R. at 428.) In December 2007, Lopinsky described her mood as "good," and she reported a decrease in crying spells since taking her medication. (R. at 574.) She reported that she had been getting out and enjoying activities with her husband. (R. at 572.) Furthermore, she testified at her hearing that her medication helped her symptoms of depression and insomnia. (R. at 41.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1165 (4th Cir. 1986). Based on this, I find that substantial evidence exists to support the ALJ's finding that Lopinsky did not suffer from a severe mental impairment.

For all of these reasons, I find that substantial evidence does not exist in the record to support the ALJ's physical residual functional capacity finding, and I recommend that the case be remanded to the ALJ for further consideration consistent with this Report and Recommendation.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence does not exist to support the Commissioner's finding with regard to Lopinsky's physical residual functional capacity;

2. Substantial evidence exists to support the Commissioner's finding that Lopinsky did not suffer from a severe mental impairment; and

3. Substantial evidence does not exist to support the Commissioner's finding that Lopinsky was not disabled under the Act and was not entitled to DIB or SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Lopinsky's motion for summary judgment, deny the Commissioner's motion for summary judgment, vacate the decision of the Commissioner denying benefits and remand this case to the ALJ for further consideration consistent with this Report and Recommendation.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2010):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     July 8, 2010.

/s/    *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE